UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL NO. 20-65 |
| v. | * | SECTION: "L" |
| WILLIAM J. BURNELL | * | |
| | * * * | |

## FACTUAL BASIS

1. Defendant, **WILLIAM J. BURNELL** ("**BURNELL**"), has indicated that he intends to plead guilty to Count One, that is conspiracy to commit bank fraud, in violation of 18 U.S.C. §§ 1344 and 1349, of the Second Superseding Indictment pending against him.

2. The United States and **BURNELL** do hereby stipulate and agree that the following facts are true and correct and that, should this matter have proceeded to trial, the Government would have proven them beyond a reasonable doubt, through the introduction of competent testimony and admissible tangible and documentary exhibits. The Factual Basis does not attempt to set forth all of the facts known to the United States regarding the allegations in the Second Superseding Indictment. The limited purpose of this Factual Basis is to demonstrate that there exists a sufficient legal basis for **BURNELL's** guilty plea. By their signatures below, the parties expressly agree that there is a factual basis supporting **BURNELL's** guilty plea. The parties also agree that this Factual Basis may, but need not, be used by the United States Probation Office and the Court in determining the applicable advisory guideline range under the United States Sentencing Guidelines or the appropriate sentence under 18 U.S.C. § 3553(a).

3. From May 2006 through April 2017, First NBC Bank was a financial institution, as defined in Title 18, United States Code, Section 20, and a member of the Federal Deposit Insurance Corporation ("FDIC") with federally insured deposit amounts.

AUSA
Defendant
Defense Counsel

4. First NBC Bank was established in 2006, with its headquarters in New Orleans, Louisiana, within the Eastern District of Louisiana, and with branch offices in Louisiana, Mississippi, and Florida.

5. First NBC Bank was the wholly-owned subsidiary of First NBC Bank Holding Company. Beginning in May 2013, First NBC Bank Holding Company was a publicly-traded company listed on the NASDAQ stock exchange. On April 28, 2017, First NBC Bank was closed by the Louisiana Office of Financial Institutions ("LOFI").

6. Ashton J. Ryan, Jr. ("Ryan"), was a founder of First NBC Bank and acted as its President and Chief Executive Officer from on or about May 2006, until on or about December 2016. Ryan was responsible for developing and executing the Bank's strategic plan, overseeing all of the Bank's affairs, and managing the Bank's day-to-day operations. Additionally, Ryan was responsible for keeping members of the Bank's Board of Directors ("the Board") informed of the Bank's true financial condition, the adequacy of its policies and procedures, and its internal controls.

7. From in or around 2006 through April 2017, **BURNELL** was employed by First NBC Bank as its Chief Credit Officer, and was responsible for, among other things, the overall quality of the Bank's lending function; the Bank's credit policies and administration; the Bank's loan recovery and collection efforts; and the Bank's monitoring and managing of past-due loans, including the approval of the Bank's internal list of past-due loans. **BURNELL** was responsible for compiling month-end reports, including lists of overdrawn borrowers and past-due loans. These reports should have accurately shown the quality of the Bank's assets, including loans. Misrepresentations on these reports would have frustrated attempts at making a true assessment of the Bank's overall financial well-being. **BURNELL** was also responsible for assigning risk ratings before the Bank issued loans to its customers. In the Bank's risk rating system, a "10" meant very low risk of loss to the Bank, while a "1" meant a high risk of loss to the Bank. From 2006 through

2



AUSA
Defendant
Defense Counsel

April 2017, **BURNELL** received compensation from the Bank of approximately $3,528,738.00.

8. From in or around 2006 through April 2017, Robert B. Calloway ("Calloway") was employed by First NBC Bank as an Executive Vice President and served as a commercial relationship manager with tax credit specialization.

9. From in or around 2009 through February 2017, Fred V. Beebe ("Beebe") was employed by First NBC Bank as a Senior Vice President and as a commercial relationship manager.

10. As a financial institution, First NBC Bank was subject to regulatory supervision by the FDIC and LOFI, charged with supervising and regulating First NBC Bank to ensure that the Bank engaged in safe and sound banking practices and complied with federal and state banking laws.

11. First NBC Bank was also required to submit to periodic safety and soundness examinations conducted by the FDIC and LOFI. First NBC Bank was required to report information regarding past-due loans to the FDIC and LOFI in advance of these examinations, which affected the regulators' conclusions regarding the Bank's financial condition.

12. In addition, First NBC Bank engaged external auditors tasked with evaluating the accuracy of the Bank's financial statements related to, among other things, the Bank's loan portfolio and investments.

### Gary Gibbs Loan Relationship

13. From in or around 2008 through in or around April 2017, Gary Gibbs was a real estate developer and borrower at First NBC Bank, both individually and through his numerous entities. Calloway was Gibbs's loan officer. Ryan served as the approving officer on Gibbs's loans, and **BURNELL** approved the credit risk rating. **BURNELL**, Ryan, and Calloway periodically discussed Gibbs's loans with each other, with other Bank employees, and at Board, Board Loan Committee, and Senior Loan Committee meetings.


AUSA
Defendant
Defense Counsel

14. From at least the summer of 2012 in Gibbs's borrowing relationship, **BURNELL**, Ryan, and Calloway knew that Gibbs's entities did not generate sufficient income to make Gibbs's loan payments. Despite this knowledge, **BURNELL**, Ryan, and Calloway approved loans to Gibbs to pay Gibbs's and other borrowers' overdrafts and existing debt service, which artificially kept Gibbs off month-end reports that **BURNELL** approved and submitted to the Board. In an effort to avoid or minimize Gibbs's appearance on the overdraft and past-due reports, **BURNELL**, Ryan, and Calloway made misrepresentations and material omissions regarding Gibbs's creditworthiness and financial status.

15. For example, **BURNELL**, Ryan, and Calloway signed dozens of loan documents over several years that assigned a false and inaccurate credit risk rating to Gibbs and his entities. In many of these loans, Gibbs and his entities were assigned a credit risk rating of "5," when in truth and in fact, **BURNELL**, Ryan, and Calloway knew they should have rated the Gibbs relationship a "3" or lower, which would have resulted in greater scrutiny.

16. For example, on or about August 24, 2012, **BURNELL**, Ryan, and Calloway made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $1 million in loan proceeds to be disbursed to Gibbs. Approximately $117,574 of those loan proceeds were used to pay Borrower F's loans.

17. On or about December 28, 2012, **BURNELL**, Ryan, and Calloway made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $150,000 in loan proceeds to be disbursed to Gibbs. Approximately $71,776 of those loan proceeds were used to pay Borrower F's loans.

18. On or about February 21, 2013, **BURNELL**, Ryan, and Calloway made false statements and material omissions in Gibbs's loan documents related to, among other things, the purpose of the loan and the source of repayment, causing $1 million in loan proceeds to be

4

AUSA
Defendant
Defense Counsel

disbursed to Gibbs. A portion of those loan proceeds were used to pay Borrower F's loans.

19. By the end of 2016, Gibbs's borrowing relationship had become one of the largest in the Bank's loan portfolio. Despite the numerous risks associated with Gibbs's loans and the substantial threat Gibbs's borrowing relationship posed to the Bank, **BURNELL**, Ryan, and Calloway continued to approve and facilitate Gibbs's loans, and they concealed the truth regarding Gibbs's inability to pay his loans despite knowing that Gibbs did not have the ability to repay his loans.

### Kenneth Charity Loan Relationship

20. Kenneth Charity was the owner of residential and commercial properties in the New Orleans area. In or around 2007, he became a borrower at First NBC Bank. Ryan was Charity's loan officer.

21. Ryan kept Charity and his related entities off the overdraft and past-due loan lists by directing his employees to keep a "cheat sheet." The cheat sheet helped Ryan determine the amount of loan proceeds Charity needed to cover loan payments and overdrafts by month-end so Ryan could keep Charity off the month-end reports. **BURNELL**, Ryan, and others continued to lend money to Charity despite the poor quality of Charity's loans, which delayed the Bank downgrading or writing off the loans.

22. **BURNELL** and Ryan knew that Charity lacked sufficient cash flow to pay his loans at the Bank. **BURNELL** and Ryan were aware that Charity did not spend, and demonstrated no interest in spending, the loan proceeds for their approved purpose.

23. Nominee D was a friend of Charity's and his business partner on certain real estate projects. Nominee D was also a guarantor on many of Charity's loans. Nominee D did not have a deposit account at the Bank and did not have signature authority on any accounts associated with Charity.

5

AUSA
Defendant
Defense Counsel

24. **BURNELL** and Ryan instructed Bank employees to process loans where Nominee D was a guarantor without receiving additional signatures from Nominee D. Neither **BURNELL** nor Ryan disclosed these practices to the Board, auditors, or examiners.

25. Charity purchased a commercial real estate space at 620 Decatur Street in the French Quarter with Bank loan proceeds in July 2008. In or around January 2011, Ryan arranged for another Bank borrower, Borrower J, to rent space from Charity at 620 Decatur Street for approximately $20,000 per month. This arrangement ensured that Charity appeared to have a stable source of income to support his loans. Borrower J operated a beignet shop in the rented space. Beebe was Borrower J's loan officer.

26. In or around October 2013, Borrower J made his last loan payment to the Bank and stopped paying rent to Charity. **BURNELL**, Ryan, and St. Angelo then arranged for the Bank to take over the beignet shop from Borrower J and make monthly payments to Charity. In or around February 2014, **BURNELL** opened an account at the Bank to operate the beignet shop. This account was controlled by **BURNELL** and Ryan. Beginning in or around April 2014 and continuing through in or around March 2017, **BURNELL** and Ryan caused the Bank, as keeper of the beignet shop, to pay $20,000 in rent every month to Charity, despite knowing that the beignet shop did not generate sufficient revenue to support its monthly rent, let alone its other operating expenses. The beignet shop's account was routinely overdrawn and presented to the Board of Directors due to the overdrafts.

27. Ryan made misrepresentations to the Board Loan Committee about the beignet shop's profitability and value. Further, when the Bank's beignet shop account was overdrawn at the end of 2014, **BURNELL** and Ryan arranged for approximately $171,000 to be drawn from Borrower J's dormant line of credit to clear the overdraft. **BURNELL**, Ryan, and Beebe refused to write off Borrower J's loans, even after Borrower J was convicted of fraud and sentenced to prison. When the Bank failed, the beignet shop's account was overdrawn by more than $200,000.

6



AUSA
Defendant
Defense Counsel

28.     Moreover, from in or around August 2014, through in or around December 2016, Ryan issued four loans to Charity for the purported purpose of enclosing the patio area at the beignet shop. **BURNELL** approved the credit risk rating for each of the four loans. In four instances—in or around August 2014, December 2015, March 2016, and August 2016—**BURNELL** and Ryan caused Bank funds to be disbursed for the full costs of the same patio enclosure which **BURNELL** and Ryan knew was never enclosed. The four loans totaled approximately $1.5 million. Several loan documents stated that the enclosure would generate additional revenue for the beignet business and increase the value of the real estate. In truth and in fact, and as **BURNELL** and Ryan knew, the loan proceeds never went to the patio enclosure. Rather, as **BURNELL** and Ryan knew, the money went to make loan payments and pay overdrafts.

### Gregory St. Angelo Loan Relationship

29.     From 2006 through September 2016, Gregory St. Angelo was the Bank's General Counsel. St. Angelo and his entities were borrowers at the Bank from 2006 through April 2017. Ryan was the loan officer for St. Angelo and his entities. **BURNELL** participated with Ryan in decisions affecting the St. Angelo loans and monitored St. Angelo's overdrafts and past-due payments.

30.     **BURNELL** and Ryan made misrepresentations and omitted material information from the Board, auditors, and examiners about St. Angelo's financial status and creditworthiness.

31.     For example, **BURNELL** and Ryan directed Bank employees to track monthly payments due on St. Angelo's loans and overdrafts in his accounts. After reviewing these reports, **BURNELL** would notify St. Angelo and Ryan of the amount needed to clear St. Angelo's accounts. Ryan would then issue loans to St. Angelo and his entities in order to clear St. Angelo's accounts, which were often overdrawn by hundreds of thousands of dollars, and make payments on other loans. This practice was designed to prevent St. Angelo from being exposed to the Board, auditors, and examiners as being a loan default risk.

AUSA
Defendant
Defense Counsel

32. From at least 2009 through 2015, Ryan caused the Bank to make false and fraudulent investments in fake tax credits for St. Angelo's projects at 622 Conti Street and 616 Girod Street in New Orleans and Annadele's Restaurant in Covington. Ryan instructed **BURNELL** to use the tax credit investment money to pay St. Angelo's loans and cover St. Angelo's overdrafts at the Bank.

33. Additionally, **BURNELL** and Ryan used St. Angelo's loan proceeds to pay other borrowers' debts or, alternatively, used other borrowers' loans to pay St. Angelo's debt. For example, from in or around June 2009 through December 2013, **BURNELL** and Ryan caused Nominee A's loans to be disbursed to St. Angelo's accounts to cover overdrafts and make loan payments on St. Angelo's loans. **BURNELL** and Ryan did not disclose in the loan documents for Nominee A's loans that they were used for St. Angelo's benefit. **BURNELL** and Ryan did not disclose in Bank documents that St. Angelo was paying other borrowers' debts.

## Frank Adolph Loan Relationship

34. From in or around August 2008 through April 2017, Frank Adolph was a borrower at the Bank. Adolph operated Metro Rediscount, a business that bought other companies' accounts receivable. Adolph submitted a certificate to the Bank listing Metro Rediscount's accounts receivable, and that certificate was included in loan documents to support Adolph's loans. Although **BURNELL** and Ryan were not Adolph's loan officers, Ryan signed Adolph's loan documents as an approving officer, and **BURNELL** approved the credit risk rating.

35. Adolph fabricated Metro Rediscount's accounts receivable by listing companies that had never done business with Metro Rediscount or that had not done business with Metro Rediscount for years. In or around August 2013, Adolph's loan officer hired an outside auditor to audit Adolph's accounts receivable on the certificate that Adolph provided to the Bank. Despite being put on notice by the auditor that the self-described accounts receivable did not exist, Adolph continued to use the same false information in subsequent certificates he submitted to the Bank.

8

AUSA
Defendant
Defense Counsel

36. Between in or around October 2013 and February 2014, Adolph's loan officer alerted **BURNELL** and Ryan about Adolph's fraudulent accounts receivable and warned them that Adolph was living beyond his means and could not pay his debt to the Bank. Despite their knowledge of Adolph's fraudulent representations to the Bank, **BURNELL** and Ryan approved additional loans for Adolph and failed to alert the Board, auditors, or examiners about Adolph's fraudulent accounts receivable. Moreover, the stated purpose of many of the loans was to finance the working capital needs of Metro Rediscount or to finance Metro Rediscount's accounts receivable, which **BURNELL** and Ryan knew were fraudulent.

### Warren Treme Loan Relationship

37. Prior to the founding of the Bank, Treme was a borrower at a different bank (Bank B) where Ryan was President. Ryan and Treme were partners in several business ventures, including Wadsworth Estates. From at least April 2008, Treme was a borrower at First NBC Bank.

38. **BURNELL** played a significant role in Treme's lending relationship. Because of Ryan and Treme's business relationship, Beebe served as the loan officer for Treme's loans, while **BURNELL** served as the approving officer and assigned the credit risk rating. **BURNELL's** involvement as the approving officer gave the false impression that **BURNELL** was providing a meaningful check on Ryan's authority at the Bank. In reality, Ryan continued to exercise influence over Treme's loans, while **BURNELL** and Beebe concealed Ryan's involvement in the Treme loans.

39. From in or around June 2014 through April 2017, **BURNELL**, Ryan, and Beebe diverted loan proceeds to Ryan and Treme's co-owned business knowing that Treme lacked sufficient income to pay his debts to the Bank. Further, **BURNELL**, Ryan, and Beebe knew that Treme was using loan proceeds on personal expenses or to make loan payments, contrary to the stated purposes of the loans.

9


AUSA
Defendant
Defense Counsel

40. For example, in or around June 2014, Beebe informed **BURNELL** that Treme was "tired of being poor." Beebe told **BURNELL** that Treme wanted Beebe to find a way to give Treme $50,000. Days later, on or about June 19, 2014, **BURNELL** and Beebe approved an approximately $910,000 loan for Treme, with approximately $140,000 in new funds. **BURNELL** and Beebe approved this loan, and **BURNELL** fraudulently approved the credit risk rating of "6," as recommended by Beebe, despite their knowledge that Treme struggled financially and that Treme's businesses had suffered net losses the prior year. Additionally, **BURNELL** and Beebe falsely stated "the loan contains normal credit risks." Further, **BURNELL** and Beebe recommended the loan's approval "due to [Treme's] good history with [the Bank]."

41. Similarly, in November 2016, to prevent Treme and his entities from appearing on a past-due loan report, **BURNELL**, Ryan, and Beebe caused an unsecured $70,000 loan to be given to Treme. **BURNELL** approved the credit risk rating of "6," as recommended by Beebe, despite **BURNELL** and Beebe's knowledge of Treme's poor financial status. The stated purpose of the loan was "temporary working capital" and "permanent financing of real estate." Contrary to the loan's stated purpose, **BURNELL**, Ryan, and Beebe fraudulently used approximately $64,000 in loan proceeds to pay Treme's loans.

### Jeffrey Dunlap Loan Relationship

42. From in or around July 2009 through April 2017, Jeffrey Dunlap was a customer at the Bank. Dunlap owned Phoenix Civil Contractors ("Phoenix"), a construction company. Beginning in or around March 2009, Ryan and Treme, through their business Wadsworth Estates, contracted with Dunlap and his company Phoenix to do construction work to prepare Wadsworth Estates for commercial development. Even though Ryan had a business relationship with Dunlap, Ryan served as the loan officer for Dunlap and Phoenix.

43. Phoenix used its accounts receivable from Wadsworth Estates and other clients as collateral for its borrowing. **BURNELL** knew that Ryan and Treme owned Wadsworth Estates.

10

AUSA
Defendant
Defense Counsel

**BURNELL** approved the credit risk rating on Dunlap's loans, even though the receivables in the loan documents listed Wadsworth Estates as an accounts receivable securing the Phoenix loans. **BURNELL** signed at least 38 loan documents that contained that information.

44. From in or around 2009 through late 2016, **BURNELL** and Ryan approved numerous loans, increases in loans, and credit extensions for Phoenix. Ryan knew that the loan proceeds were the primary source of Phoenix's payment of principal and interest. During this time, Phoenix's debt to the Bank continued to grow. Despite this, **BURNELL** kept Phoenix's risk rating a "6," misrepresenting Phoenix's creditworthiness and the risk of loss to the Bank from Phoenix's loans.

45. Records, documents, and other tangible objects, along with the testimony of competent witnesses, would be introduced at trial to prove the facts set forth above.

**APPROVED AND AGREED TO:**

_____     9/13/2022
MATTHEW R. PAYNE                      Date
NICHOLAS D. MOSES
J. RYAN McLAREN
RACHAL CASSAGNE
Assistant United States Attorneys


_____     9/13/22
BRIAN CAPITELLI                       Date
RALPH CAPITELLI
TYFFANI LAUVE
Counsel for William J. Burnell


_____     9/13/22
WILLIAM J. BURNELL                    Date
Defendant